## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIALYSIS PATIENT CITIZENS, | : | |
| JANE DOE 1, | : | CIVIL ACTION NO. 2:17-cv-02191 |
| JOHN DOE 2, | : | JURY TRIAL DEMANDED |
| JANE DOE 4, and | : | |
| JOHN DOE 5, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS | : | |
| and QCC INSURANCE COMPANY | : | |
| | : | |
| Defendants. | : | |
| | : | |

### [PROPOSED] ORDER

**AND NOW**, this _____ day of _____, 2017, upon consideration

of Plaintiffs' Motion for a Preliminary Injunction, it is hereby **ORDERED** that Plaintiffs'

Motion for a Preliminary Injunction is **GRANTED**, and Independence Blue Cross and QCC

Insurance Company are **ENJOINED** from refusing to accept premium payments from third-

parties, including but not limited to the American Kidney Fund.

Plaintiffs are **ORDERED** to post a bond pursuant to Fed. R. Civ. P. 65(c) in the amount

of $1,000.00 (one thousand dollars and zero cents).

### BY THE COURT:

_____

Mitchell S. Goldberg, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DIALYSIS PATIENT CITIZENS, | : | |
| JANE DOE 1, | : | CIVIL ACTION NO. 2:17-cv-02191 |
| JOHN DOE 2, | : | JURY TRIAL DEMANDED |
| JANE DOE 4, and | : | |
| JOHN DOE 5, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS | : | |
| and QCC INSURANCE COMPANY | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

For the reasons set forth in the accompanying memorandum of law, Plaintiffs respectfully

request that the Court enter a preliminary injunction pursuant to Fed. Civ. P. 65(a) to prevent

Independence Blue Cross from unlawfully rejecting premium assistance for and cancelling the

insurance coverage of low-income renal dialysis patients.

Respectfully submitted,

Dated:  May 15, 2017

/s/ Mark H. Gallant
Mark H. Gallant (51767)
Aaron Krauss (62419)
Harper Seldin (318455)
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000
mgallant@cozen.com
Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIALYSIS PATIENT CITIZENS, | : | |
| JANE DOE 1, | : | CIVIL ACTION NO. 2:17-cv-02191 |
| JOHN DOE 2, | : | JURY TRIAL DEMANDED |
| JANE DOE 4, and | : | |
| JOHN DOE 5, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS | : | |
| and QCC INSURANCE COMPANY | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to a recent policy change, Defendants Independence Blue Cross and its subsidiary, the QCC Insurance Company (collectively "IBC") are refusing to accept premium payments from charities on behalf of poor, chronically ill Pennsylvanians. Rather than accept charity, IBC is instead threatening to cancel – and in at least one case actually did cancel – the insurance of people who need it most. In doing so, IBC is targeting people with end stage renal disease ("ESRD") by singling them out for restrictions based on the source of their premium payments. Nothing authorizes IBC to prevent premium payments on behalf of its insureds by a charitable organization. On the contrary, IBC's refusal to accept payments for insurance on behalf of ESRD patients is unlawful under both federal and state law, and poses an immediate threat of irreparable harm to vulnerable ESRD patients.

## I.    Factual Background

IBC is a Pennsylvania Health Plan Corporation. As such, IBC receives state tax exemptions to serve as an "insurer of last resort" in Pennsylvania under the Pennsylvania Health

Plan Corporations Act. See, e.g., 40 P.S. §§ 981-3, 981-4; Ciamaichelo v. Independence Blue Cross, 589 Pa. 415, 418 (2006). Plaintiff Dialysis Patient Citizens is a non-profit patient advocacy organization whose members have ESRD, many of whom receive financial assistance to pay their health insurance premiums from the American Kidney Fund ("AKF"). See Jamgochian dec. at ¶ 4-5 and 12-15. The Individual Plaintiffs all have ESRD, bought health insurance policies from IBC, and have relied on premium support from the AKF to pay for their health insurance. See Jane Doe 1 dec. at ¶ 4, 13-14; John Doe 2 dec. at ¶ 4, 9-10; Jane Doe 4 dec. at ¶ 8, 15, 22; John Doe 5 dec. at ¶ 4, 14, 18.

AKF assists qualifying indigent ESRD patients by making health insurance premium program grants that enable them to purchase either supplemental Medicare (i.e., Medigap) coverage or individual qualified health plan ("QHP") coverage through the insurance Exchanges established under the Affordable Care Act of 2010 (the "ACA").[1] See Jamgochian dec. at ¶ 33-40. After years of accepting premium support under its current forms of policies, see Jamgochian dec. at ¶ 43, IBC recently began rejecting payments from the AKF, and instructing policyholders who received AKF support that they must either pay their premiums themselves or IBC will cancel their health insurance. See Exhibit 6.

Health insurance is critical for ESRD patients because the only way to sustain their lives – other than a kidney transplant – is dialysis, which is very expensive. See Jamgochian dec. at ¶ 11; Jane Doe 1 dec. at ¶ 7; John Doe 2 dec. at ¶ 7; Jane Doe 4 dec. at ¶ 29; John Doe 5 dec. at ¶ 9. IBC is specifically targeting the premium support AKF provides to ESRD patients. See

---

[1] In recognition of the fact that some issuers might enroll disproportionately sick or costly patients, Congress included both premium stabilization and risk adjustment programs in the ACA to mitigate pricing risk and what would otherwise be incentives for adverse selection. See generally 42 U.S.C. §§ 18061-63. Under these programs, there is a maximum difference of 3 to 1 between the highest and lowest premiums that may be charged by an issuer, and lower risk plans are required to subsidize plans with higher risk populations.

Jamgochian dec. at ¶ 9-53. IBC is not targeting (or refusing to accept) premium support for individuals who do not have ESRD. See Jamgochian dec. at ¶ 50. IBC's rejection of premium support for low-income ESRD policyholders who use AKF funds is an unlawful pretext used to purge these policyholders from IBC's membership rolls to generate greater profits. See Jamgochian dec. at ¶ 41, 47-48.

## A.  The Parties

Plaintiff Dialysis Patient Citizens ("DPC") is a non-profit educational and social welfare organization operating under section 501(c)(4) of the Internal Revenue Code. See Jamgochian dec. at ¶ 4. DPC's purpose is to improve the quality of life of patients with kidney disease through advocacy and education. See Jamgochian dec. at ¶ 4. DPC has over 29,000 members, all of whom are either kidney disease patients or their family members. See Jamgochian dec. at ¶ 12. DPC is a patient-led organization with a Board of Directors consisting entirely of ESRD patients who are individuals on dialysis or who have received kidney transplants. See Jamgochian dec. at ¶ 5. The organization's bylaws require that the President, Vice President and a majority of the Board be current dialysis patients. See Jamgochian dec. at ¶ 5. Approximately 87% of DPC's members are on dialysis. See Jamgochian dec. at ¶ 12; Jane Doe 1 dec. at ¶ 4; John Doe 2 dec. at ¶ 4; Jane Doe 4 dec. at ¶ 8; John Doe 5 dec. at ¶ 6. Of those who are on dialysis, about 23% – more than 6,000 individuals – presently receive financial assistance to help pay for their health insurance coverage, including premiums for Medicare Part B, Medigap and private commercial coverage. See Jamgochian dec. at ¶ 15.

The Individual Plaintiffs all have ESRD, are on dialysis, have purchased health insurance coverage from IBC, and receive AKF assistance to pay their premiums. See Jane Doe 1 dec. at ¶ 4, 13-14; John Doe 2 dec. at ¶ 4, 9-10; Jane Doe 4 dec. at ¶ 8, 15, 22; John Doe 5 dec. at ¶ 4, 8, 14, 18.

3

Plaintiff Jane Doe 1 is a 61 year old African-American resident of Philadelphia, Pennsylvania, who has been diagnosed with ESRD. See Jane Doe 1 dec. at ¶ 1, 4. As a result of her ESRD, she became (and is) disabled and unable to work. See Jane Doe 1 dec. at ¶ 11. Jane Doe 1 receives dialysis three times a week, and has contracted with IBC for health insurance. See Jane Doe 1 dec. at ¶ 6, 13. She purchased her insurance, known as a Qualified Health Plan (or "QHP") from IBC on the Federal Exchange established pursuant to the Affordable Care Act ("ACA"). See Jane Doe 1 dec. at ¶ 13. She both receives and requires premium assistance from the AKF to pay her premiums. See Jane Doe 1 dec. at ¶ 14, 16.

Plaintiff John Doe 2 is a 66 year old African-American resident of Philadelphia, Pennsylvania, who has been diagnosed with ESRD. See John Doe 2 dec. at ¶ 1, 4. He receives dialysis three times a week, and has purchased a Medigap policy from IBC. See John Doe 2 dec. at ¶ 5, 9. He both receives and requires premium assistance from the AKF to pay his premiums. See John Doe 2 dec. at ¶ 10, 12. In late 2016, IBC refused to accept premium support from the AKF on John Doe 2's behalf. See John Doe 2 dec. at ¶ 14. As a result, John Doe 2 lost his Medigap coverage between December 2016 and March 2017. See John Doe 2 dec. at ¶ 15. His coverage has since been reinstated. See John Doe 2 dec. at ¶ 16.

Plaintiff Jane Doe 4 is a 47 year old African-American resident of Philadelphia, Pennsylvania, who has been diagnosed with ESRD. See Jane Doe 4 dec. at ¶ 1, 8. She receives dialysis three times a week, and has contracted with IBC for Medigap insurance coverage. See Jane Doe 4 dec. at ¶ 9, 15. Jane Doe 4's Medigap premiums have been paid directly by the AKF since she started dialysis. See Jane Doe 4 dec. at ¶ 22, 24. However, IBC recently refused to cash the AKF check and returned it to the clinic and demanded that Jane Doe 4 pay IBC directly. See Jane Doe 4 dec. at ¶ 25-26. She is unemployed due to her kidney disease and dialysis and

requires AKF assistance to afford Medigap and avoid exposure to out-of-pocket, and uncapped Medicare fees. See Jane Doe 4 dec. at ¶ 11, 17-18.

Plaintiff John Doe 5 is a 29 year old Caucasian resident of Palm, Pennsylvania who has been diagnosed with ESRD. See John Doe 5 dec. at ¶ 1-7. John Doe 5 undergoes peritoneal dialysis at home every night. See John Doe 5 dec. at ¶ 10. Although he works part time, he does not receive insurance through his employer. See John Doe 5 dec. at ¶ 12-13. Instead, he has applied for and receives Medicare. See John Doe 5 dec. at ¶ 14. He purchased a Medigap policy from IBC. See John Doe 5 dec. at ¶ 14. The AKF has provided John Doe with premium support to pay his Medicare Part B premiums and his Medigap premiums for several years. See John Doe 5 dec. at ¶ 18. IBC recently refused to cash the AKF check and demanded that John Doe 5 pay IBC directly. See John Doe 5 dec. at ¶ 21-22.

Defendants Independence Blue Cross and QCC Insurance Company, collectively referred to as IBC, are health insurers organized and licensed under the laws of Pennsylvania. QCC Insurance Company is a wholly-owned subsidiary of Independence Blue Cross. IBC is a "Blue Plan" authorized to operate in Pennsylvania pursuant to the Health Plan Corporations Act (or "HPCA"), 40 P.S.C. § 6101 et seq., § 6301 et seq. As a Blue Plan, IBC receives a special exemption from state and local taxes and serves as an "insurer of last resort." See, e.g., 40 P.S. §§ 981-3, 981-4; Ciamaichelo, 589 Pa. at 418.

**B.    End stage renal disease ("ESRD")**

ESRD is the last stage of chronic kidney failure. See Jamgochian dec. at ¶ 10. Dialysis is a process of simulating working kidneys by using a machine to artificially clean blood and remove excess fluid. See Jamgochian dec. at ¶ 11. Dialysis can be done in a specialized facility, or at home under the general supervision and periodic care of a renal professional. See Jamgochian dec. at ¶ 11; John Doe 5 dec. at ¶ 10. Without dialysis or a kidney transplant, a

person with ESRD will die within a short period of time. See Jamgochian dec. at ¶ 11; Jane Doe 1 dec. at ¶ 7; John Doe 2 dec. at ¶ 7; Jane Doe 4 dec. at ¶ 29; John Doe 5 dec. at ¶ 9.

The time needed for dialysis can vary, but it is generally multiple times a week for hours at a time. See Jamgochian dec. at ¶ 11. For example, Jane Doe 1's in-center hemodialysis treatments are three times a week for four hours, see Jane Doe 1 dec. at ¶ 6, while John Doe 5's in-home peritoneal dialysis treatments are every day and last eight to ten hours. See John Doe 5 dec. at ¶ 10. Dialysis is a constant burden and dramatically affects ESRD patients' life activities, including their ability to work. See Jamgochian dec. at ¶ 14; Jane Doe 1 dec. at ¶ 11; Jane Doe 4 dec. at ¶ 11; John Doe 5 dec. at ¶ 12. As a result, ESRD is a difficult and expensive disease to treat and manage.

Individuals with ESRD frequently have serious co-morbid conditions, including diabetes and heart disease. See Jamgochian dec. at ¶ 56. ESRD patients also are disproportionately African-American, who are three times more likely to be diagnosed with ESRD than Caucasians.[2] See Jamgochian dec. at ¶ 13. At least some of ESRD's disproportionate impact on African-Americans is driven by the fact that African-Americans are twice as likely as Caucasians to be diagnosed with diabetes,[3] and seven to twenty times more likely to be diagnosed with

---

[2] See https://www.usrds.org/2010/pdf/v2_02.pdf?zoom_highlight=disparities#search=%22disparities%22. Although only 13.2% of the United States population is African-American, 35% of the ESRD patients in the United States are African-American.

[3] See https://academic.oup.com/ndt/article/17/2/198/1808880/End-stage-renal-failure-in-African-Americans. Diabetes is a leading cause of ESRD. Additionally, African-Americans disproportionately suffer from the more severe Type 2 diabetes (as opposed to the less severe Type 1 diabetes). Type 2 diabetes is more likely to lead to other health complications and co-morbidities.

hypertension.[4]  See Jamgochian dec. at ¶ 13.  Even controlling for both income and age, African-Americans suffer from ESRD at a rate 3.5 times greater than Caucasians.[5]

## C.    Insurance and ESRD

Treating ESRD is expensive, and the ability of ESRD patients to work is severely limited by their illness and rigorous treatment schedules.  See Jamgochian dec. at ¶ 14; Jane Doe 1 dec. at ¶ 11; Jane Doe 4 dec. at ¶ 11; John Doe 5 dec. at ¶ 12.  Congress has long recognized the hardship and expense of ESRD.  In 1972, Congress amended the Social Security Act to allow individuals under the age of 65 who suffer from ESRD, and who meet certain eligibility requirements, to enroll in Medicare.  See Jamgochian dec. at ¶ 17.  Those requirements include U.S. citizenship, having a certain number of work credits, and paying Social Security taxes.  See 42 U.S.C. § 426-1.

As a result many, but not all, ESRD patients can qualify for Medicare.  See Verified Complaint at ¶ 38.  Individuals can qualify for Medicare ESRD coverage after a three-month waiting period following the initiation of regular renal dialysis.  See Jamgochian dec. at ¶ 17; 42 U.S.C. § 426-1.  For the next 30 months, patients have a choice of enrolling in Medicare or using commercial coverage as primary, with secondary Medicare coverage.  See 42 U.S.C. § 1395y(b)(1)(C).  Many people choose to retain primary commercial coverage for this overlapping period.  See Jamgochian dec. at ¶ 22.  Medicare includes a 20% coinsurance requirement and has no cap on out-of-pocket costs for enrollees.  See Jamgochian dec. at ¶ 26.  These gaps in coverage expose ESRD patients who are covered by Medicare to significant

---

[4]See https://academic.oup.com/ndt/article/17/2/198/1808880/End-stage-renal-failure-in-African-Americans.  African-Americans also develop hypertension an average of ten years earlier than Caucasians.  See https://academic.oup.com/ndt/article/17/2/198/1808880/End-stage-renal-failure-in-African-Americans.

[5] See http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0048407.

expenses. See Jamgochian dec. at ¶ 26. Protection against potentially unlimited out-of-pocket expenses for renal dialysis patients may be obtained through Medigap policies, which are themselves costly. See Jamgochian dec. at ¶ 27. Additionally, many providers refuse to accept new Medicare patients or participate in Medicare and commercial coverage, unlike Medicare, can cover an ESRD patient's family members. See Jamgochian dec. at ¶ 23.

Prior to the enactment of the Affordable Care Act in 2010, individuals with ESRD generally could not obtain coverage in the private insurance market: insurers would reject them based on their preexisting condition, or charge exorbitant and unaffordable premiums for coverage through high risk pool products. See Jamgochian dec. at ¶ 19. The ACA, however, required insurers for the first time to "accept every employer and individual . . . who applies for" coverage. See 42 U.S.C. § 300gg-1(a). Through such "guaranteed coverage," the ACA, for the first time, has enabled people with pre-existing conditions – including those with kidney disease – to buy private health insurance as a matter of right. See Jamgochian dec. at ¶ 19-21. The ACA also strictly and exclusively limits the grounds on which individual coverage may be cancelled by an issuer. See 42 U.S.C. § 300gg-2(b). It also barred insurers from denying coverage based on a person's medical condition, disability or health needs. See 42 U.S.C. § 18022(b)(4)(D).

### D.    The American Kidney Fund

The American Kidney Fund is a 501(c)(3) non-profit organization founded in 1971. See Jamgochian dec. at ¶ 34. Among other services, the AKF provides financial support to patients with kidney failure to enable them to afford health insurance. See Jamgochian dec. at ¶ 33. In 2016, the AKF made treatment-related grants to more than 93,000 low-income dialysis patients in 50 states, the District of Columbia, and every U.S. territory, representing one out of every five U.S. dialysis patients. See Jamgochian dec. at ¶ 34; Verified Complaint at ¶ 60. The AKF pays premiums for individuals with ESRD receiving dialysis. See Jamgochian dec. at ¶ 33; Verified

Complaint at ¶ 61. AKF's premium support for low-income dialysis patients has been authorized and approved by the U.S. Department of Health and Human Services ("HHS") for 20 years.[6] See Jamgochian dec. at ¶ 37-40; Exhibit 4. Both on its website and in its brochures, the National Institutes of Health ("NIH"), a component of HHS, continues to encourage low-income dialysis patients to contact the AKF, which the NIH explains "has grants to help pay health plan premiums."[7] See Jamgochian dec. at ¶ 39; Exhibit 5.

AKF grants are given for a one-year period and are based on financial need. See Jamgochian dec. at ¶ 40; Verified Complaint at ¶ 61. To qualify for AKF assistance, ESRD recipients must demonstrate that their monthly household income does not exceed reasonable monthly expenses by more than $600, and that their total liquid assets, such as savings accounts and investment accounts, do not exceed $7,000. See Jamgochian dec. at ¶ 35. Grant recipients must also obtain a physician certification, a referral letter signed by a social worker or administrator at a dialysis provider, and complete an individual Patient Grant Application which requests detailed financial information about the patient's household. See Jamgochian dec. at ¶ 35. There is no requirement that any AKF grant recipient receive treatment at any particular facility, or at any facility owned or operated by any particular company. See Jamgochian dec. at ¶ 36; Jane Doe 1 dec. at ¶ 15; John Doe 2 dec. at ¶ 11; Jane Doe 4 dec. at ¶ 23; John Doe 5 dec. at ¶ 19.

Based on these conditions, the HHS Office of Inspector General (the "OIG") issued an Advisory Opinion in 1997 (No. 97-1), which expressly authorized contributions by the AKF for purchases of Medigap coverage for ESRD patients using funds donated to the AKF by dialysis

---

[6] See https://oig.hhs.gov/fraud/docs/advisoryopinions/1997/kdp.pdf.

[7] See https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/financial-help-treatment.

companies. See Jamgochian dec. at ¶ 40; Exhibit 4. In approving this arrangement the OIG favorably observed that the availability of "AKF's payment of premiums will expand, rather than limit, beneficiaries freedom of choice [of health coverage]." Exhibit 4 at page 6. Medicare itself also accepts AKF grants to pay for Part B coverage for ESRD patients. See Verified Complaint at ¶ 57.

### E. IBC is using a policy against accepting AKF funding as a proxy to discriminate against ESRD policyholders

The Individual Plaintiffs each have received AKF grants and have used them to pay their insurance premiums to IBC for more than a year, as have hundreds of DPC's members who live in Pennsylvania. See Jamgochian dec. at ¶ 15, 51; Jane Doe 1 dec. at ¶ 14; John Doe 2 dec. at ¶ 10; Jane Doe 4 dec. at ¶ 22; John Doe 5 dec. at ¶ 18.

In January 2017, IBC started sending letters to ESRD policyholders in Pennsylvania regarding IBC's new policy of refusing premium payments funded by AKF grants. See Jamgochian dec. at ¶ 51. These form letters state:

> The Centers for Medicare & Medicaid Services ("CMS") has expressed significant concerns with certain third party payments to health insurers on behalf of enrolled individuals. Based on these concerns, Independence has a policy to not accept premium payments made by certain third parties. For premium payments due on or after March 1, 2017, you must pay your Independence premium directly. We will not accept payments from certain third parties, including the American Kidney Fund. If you do not make payments directly, the funds will be returned and your health plan is subject to cancellation for non-payment. (Emphasis added.)

Exhibit 6. IBC also has posted its policy against accepting charitable premium support for ESRD patients on its website. See Exhibit 1; see also Exhibit 2; Exhibit 3.

IBC's policy has no warrant in law, and the "concerns" IBC attributes to CMS as the basis for its own discriminatory policy are distorted. IBC's communications to its insureds do not inform them that, since 1997, the HHS OIG has expressly permitted AKF premium payments

to support ESRD patients so long as certain conditions – including not requiring patients to use any particular provider – were met.[8]  See Exhibit 4.  IBC fails to disclose that the NIH encourages AKF's payment of premiums.[9]  See Exhibit 5 at page 12.  Nor does IBC reveal that an Interim Final Rule CMS promulgated that is the ostensible basis of putative "concerns" did not bar premium support from the AKF or other section 501(c)(3) charitable organizations, and a provision that would have allowed issuers to approve or reject AKF premium support was enjoined by a Federal District Court on January 25, 2017.  See Dialysis Patient Citizens v. Burwell, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017), a copy of which is attached as Exhibit 11.

### F.     IBC has breached its contracts

IBC refused to accept a check from the AKF on behalf of John Doe 2.  See John Doe 2 dec. at ¶ 14.  As a result of IBC's refusal to accept AKF's check, John Doe 2's Medigap insurance policy lapsed, and John Doe 2 was without coverage for three months.  See John Doe 2 dec. at ¶ 15.  Nothing in John Doe 2's insurance contract with IBC permits IBC to refuse premium payments on the basis of the source of funds used to satisfy the premiums.

IBC also refused to accept a check from the AKF from another DPC member.[10]  When this member asked his son to lend him the money to pay his premiums, IBC refused to accept his son's credit card.  See Verified Complaint at ¶ 98-99.  Instead, IBC demanded that his son wire money to his father so that his father could pay his premiums out of his own account.  See

---

[8] See https://oig.hhs.gov/fraud/docs/advisoryopinions/1997/kdp.pdf.

[9] See https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/financial-help-treatment.

[10] Because this member is a Syrian National who is a legal resident in the United States, he was and is understandably reluctant to be a party or a witness to this lawsuit in these turbulent times.

Verified Complaint at ¶ 99. Nothing in this member's contract with IBC permitted IBC to refuse to accept this member's son's credit card. See Verified Complaint at ¶ 99.

Finally, IBC refused to accept AKF checks on behalf of Jane Doe 4 and John Doe 5. See Jane Doe 4 dec. at ¶ 25; John Doe 5 dec. at ¶ 21. These members were forced to pay their premiums directly. See Jane Doe 4 dec. at ¶ 26; John Doe 5 dec. at ¶ 22. IBC also told other DPC members that it would not accept AKF checks on their behalf. See Jane Doe 1 dec. at ¶ 19; Exhibit 6. These members were similarly forced to find alternate ways to pay their premiums. See Jane Doe dec. at ¶ 20.

## II.    Standard For A Preliminary Injunction

Fed. R. Civ. P. 65(a) authorizes the Court to issue preliminary injunctions upon notice to the adverse party. To obtain a preliminary injunction plaintiffs must demonstrate that (A) they are likely to succeed on the merits of their claim, (B) they are likely to suffer irreparable injury without the requested relief, (C) the balance of harms favors them, and (D) relief is in the public interest. See Issa v. School Dist. of Lancaster, 847 F.3d 121, 131 (3d Cir. 2017). To demonstrate a likelihood of success on the merits, the movant need only prove a "prima facia case," not a "certainty" that he or she will prevail. See Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001). Victory need not be "wholly without doubt"; rather, the movant needs only to show a "reasonable probability of success." See Issa, 847 F.3d at 131.

Plaintiffs are reasonably likely to succeed on the merits of their claims because IBC is discriminating against the Individual Plaintiffs and DPC's members in violation of federal law, breaching its contracts with the Individual Plaintiffs by refusing to accept their premium payments, and violating Pennsylvania law by refusing to accept third party premium support. DPC has associational standing and derivative standing to challenge IBC's coverage denials on behalf of its members, and DPC's members and the Individual Plaintiffs will suffer extreme and

irreparable injury without an injunction because, without the treatment covered under their existing insurance policies, they will die from ESRD-related complications. The balance of harms favors keeping ESRD patients insured and alive over allowing IBC to reject their premium payments after years of accepting premium support from the AKF. Finally, the public interest is served by protecting ESRD patients' access to lifesaving care and enforcing anti-discrimination laws that protect persons with disabilities.

## III.   Argument

### A.   Plaintiffs are likely to succeed on the merits of their claims

Plaintiffs have a reasonable likelihood of prevailing on the merits of their litigation as set forth below.

#### 1.   IBC is discriminating against ESRD patients on the basis of their health condition in violation of the ACA, 42 U.S.C. § 18116

Plaintiffs are likely to succeed on the merits of their claim that IBC's conduct violates section 1557 of the ACA, 42 U.S.C. § 18116, and related legal prohibitions against discrimination based on a person's disability or medical condition. As a health program or activity receiving federal funds, IBC is prohibited from discriminating against ESRD patients on the basis of their heath condition. IBC does not ask other policyholders how they pay their premiums, or even for assurances that their premiums are not paid from illicit funds. Yet IBC has singled out policyholders with ESRD by inquiring as to the source of funds for their premium payments, and refusing to accept payments from by third party charities on their behalf. IBC is unlawfully targeting these policyholders because they have ESRD, a disabling condition that is expensive to treat.

#### a.   The ACA prohibits IBC discriminating against policy-holders on the basis of disability

Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 provides that:

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited by . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance. . . The enforcement mechanisms provided for and available under such . . . section 504 . . . shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116 (emphasis added).

42 U.S.C. § 18116 also creates a private right of action. See Southeastern Pa. Transp. Auth. v. Gilead Sciences, Inc., 102 F. Supp. 3d 688, 698 (E.D. Pa. 2015). Accord Callum v. CVS Health Corp., 137 F. Supp. 3d 817, 848 (D.S.C. 2015); Rumble v. Fairview Health Servs., 2015 WL 1197415 at *7 n.3 (D. Minn. Mar. 16, 2015). That statute "expressly incorporates four federal civil rights statutes and includes the kind of rights-creating language found in those statutes." SEPTA, 102 F. Supp. 3d at 698. "The cross-reference to these [federal civil rights] statutes and the use of similar rights-creating terms manifest Congressional intent to create a private right." SEPTA, 102 F. Supp. 3d at 698. The statute also expressly incorporates those civil rights statutes' enforcement mechanisms. Plaintiffs therefore have a private right of action under the ACA for discrimination claims on the basis of disability.

IBC is a "health program or activity, any part of which is receiving federal financial assistance" under the Affordable Care Act. See 42 U.S.C. § 18116; 45 C.F.R. § 92.4. The plans at issue are covered "health programs" pursuant to 45 C.F.R. § 92.4. IBC receives federal financial assistance. See, e.g., https://www.opm.gov/our-inspector-general/reports/2014/audit-of-independence-blue-cross-philadelphia-pennsylvania-1a-10-55-14-027.pdf. IBC is therefore prohibited under the ACA from discriminating against individuals based on disability under section 504 of the rehabilitation act.

14

### b. ESRD is a disability under the ACA and the Rehabilitation Act

DPC's members and the Individual Plaintiffs are disabled within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, based on their ESRD. The Rehabilitation Act prohibits discrimination based on disability, defined as "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 794(a); 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(A). ESRD removes the natural ability to eliminate bodily waste. Eliminating bodily waste is a major life activity because death results without it. ESRD may also substantially limit DPC's members and Individual Plaintiffs' ability to work, another major life activity, because of the length and frequency of dialysis sessions and the impact on their energy and schedules. See, e.g., Jane Doe 1 dec. at ¶ 11; Jane Doe 4 dec. at ¶ 12; John Doe 5 dec. at ¶ 13. End stage renal disease or kidney failure which necessitates dialysis has been held to be a disability in this Circuit. See Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 385 (3d Cir. 2004). Plaintiffs are therefore disabled within the meaning of the Rehabilitation Act, and IBC cannot discriminate against them under the ACA.

### c. IBC is discriminating against ESRD patients in violation of § 18116 and other anti-discrimination requirements of the ACA

IBC is discriminating against ESRD policyholders based on their disability by refusing to accept premium support for their insurance purchases. IBC widely accepts premium support for persons without ESRD, including (without limitation) contributions from employers who sponsor ERISA plans. IBC is applying its policy against premium support only against policyholders with ESRD by targeting them and the specific charities that exclusively provide premium support to those like them.

IBC's discriminatory conduct violates other anti-discrimination provisions of the ACA. IBC offers plans on marketplace exchanges, and sells Medicare Advantage plans issued under Medicare Part C and Part D. Federal regulations provide that an insurance company shall not:

(1) <u>Deny, cancel, limit, or refuse to issue or renew a health-related insurance plan</u> or policy or other health-related coverage, or deny <u>or limit coverage of a claim</u>, or impose additional cost sharing or other limitations or restrictions on coverage, <u>on the basis of</u> race, color, national origin, sex, age, or <u>disability</u>.

45 C.F.R. 92.207. IBC is denying, canceling, and refusing to renew health-related insurance plans and imposing additional cost sharing or other limitations or restrictions on coverage on the basis of DPC's members and the Individual Plaintiffs' protected disability. IBC also is simultaneously violating the ACA's prohibition against the establishment of rules of eligibility based on medical history and disability.

Thus, 42 U.S.C. § 300gg-4 provides that "a health insurance issuer offering group or individual health insurance coverage may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan or coverage based on . . . (1) Health status. (2) Medical condition (including both physical and mental illnesses). (3) Claims experience. (4) Receipt of health care. (5) Medical history. . . (8) Disability." IBC is violating all of these provisions by establishing rules of eligibility based on patients' medical history (receipt of dialysis) and disability (ESRD).

Plaintiffs' motion in this case is strongly supported by the order awarding injunctive relief against similar policies of another Blue Cross plan in <u>John East v. Blue Cross and Blue Shield of Louisiana</u>, 2014 WL 8332136 (M.D. La. Feb. 24, 2014), a copy of which is attached as Exhibit 12. There, BCBS of Louisiana had changed its policies, under analogous circumstances, to reject insurance premiums on behalf of HIV/AIDS patients from the Ryan White Program. The Court relevantly found that plaintiffs were likely to prevail on the merits under the traditional 4-pronged preliminary injunction test "because the Affordable Care Act contains an express Nondiscrimination provision" that prevents the denial of benefits associated with a particular medical condition.[11] <u>See East</u>, 2014 WL 8332136 at *2 n.1.

---

[11] After the Court's ruling, CMS amended its regulations to affirmatively require issuers to accept Ryan White Funds from AIDs patients. <u>See</u> 45 C.F.R. § 156.1250.

Plaintiffs' motion also is supported by a recent decision by the District Court for the Eastern District of Texas in DPC v. Burwell, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017), a copy of which is attached as Exhibit 11, enjoining an Interim Final Rule that would have permitted QHP issuers to reject third-party grants from the AKF to pay for Exchange coverage.[12] Plaintiffs filed an emergency motion for temporary restraining order and preliminary injunction to stop the implementation of the Interim Final Rule. See DPC, 2017 WL 365271 at *1. In granting the injunction, the Court held that plaintiffs demonstrated a reasonable probability of success by showing that defendants likely violated the Administrative Procedure Act and that plaintiffs "are likely to succeed on the merits because the Rule is arbitrary and capricious." DPC, 2017 WL 365271 at *6. The Court explained that:

> HHS failed to consider that the **Rule would leave thousands of Medicare-ineligible ESRD patients without health insurance**, which is clearly an important aspect of the problem. Finally, **the Rule departed from HHS's prior guidance without acknowledging that it was doing so**. See FCC v. Fox Television Stations, 556 U.S. 502, 516 (2009) (concluding HHS's failure to display "awareness" it was "changing its position" from its longstanding guidance required vacatur of the rule). **HHS has long accepted the practice of charitable premium assistance, and the Rule neither addresses that HHS is changing its position nor provides a reasoned explanation for why the Rule violates OIG guidance**. See Advisory Opinion No. 97-1, Office of Inspector General, Dep't of Health & Human Servs., at 5 (1997).

---

[12] As the Court explained:

> On December 14, 2016, HHS announced a new regulation: Interim Final Rule with Comment Period . . . [that] would require dialysis providers to disclose to patients that they are contributing to charities such as AKF. The Rule would also require dialysis providers to notify insurers which premiums will be paid for by charitable organizations. The dialysis providers would then have to "obtain assurance" from insurers that they will accept charitable premium assistance payments, and if such assurances are not provided, the dialysis providers would need to take "reasonable steps" to ensure such payments are not made.

DPC, 2017 WL 365271 at *5.

DPC, 2017 WL 365271 at *17-18 (emphasis added). While not binding on this Court, the reasoning in DPC supports Plaintiffs' contention that charitable premium assistance is a longstanding permissible practice, that IBC's actions are discriminatory in violation of federal law, and that Plaintiffs are reasonably likely to prevail on the merits of their discrimination claims against IBC.

2. **IBC's refusal to accept third party premium assistance violates the ACA because it discriminates based on disability**

The ACA also prohibits discrimination on the grounds prohibited under the Rehabilitation Act. See 42 U.S.C. § 18116. IBC's refusal to accept third party premium payments discriminates against individuals disabled by ESRD.

IBC's refusal to accept third party premium support is targeted specifically at the American Kidney Fund. AKF only awards grants to individuals with ESRD, meaning that 100% of those affected by IBC's policy are disabled. See Jamgochian dec. at ¶ 33-36. IBC's policy also has the collateral effect of eliminating coverage for the family members of policyholders who have ESRD. IBC is denying ESRD patients meaningful access to the benefits of a health program and is excluding the DPC's members and Individual Plaintiffs from those benefits in violation of the ACA. IBC's discrimination is exacerbated by the fact that ESRD disproportionately affects individuals of African-American descent. See https://www.usrds.org/2010/pdf/v2_02.pdf?zoom_highlight=disparities#search=%22disparities%22.

3. **IBC's cancelation of individual coverage based on the source of premium finding is further prohibited by the guaranteed coverage requirements of the ACA**

Plaintiffs also are reasonably likely to prevail on the claim that IBC's policy of terminating coverage of persons whose premiums are funded by the AKF violates the guaranteed coverage provisions of the ACA. The ACA guarantees qualified individuals the right to obtain

and renew individual coverage through the Exchange. See 42 U.S.C. § 300gg-1(a). As part of

that guarantee, the ACA strictly and exclusively limits the circumstances under which an issuer

may terminate existing coverage. See 42 U.S.C. §§ 300gg-2(b), 300gg-42(b). Under these

provisions of the Public Health Service Act (as amended by the ACA) – both of which contain

individual focused, rights creating language (see §§ 300gg-2(a), 300gg-42(a)[13]) – QHP coverage

may be cancelled (i.e., terminated) only for specifically enumerated grounds. See 42 U.S.C.

§ 300gg-2(b). These include (without limitation) moving from the area, procuring coverage

through fraud, or "nonpayment of premiums or contributions." See 42 U.S.C. § 300gg-2(b).

The latter is further defined as a "failure to pay" or to "timely" pay premiums in accordance with

the terms of the coverage. See 42 U.S.C. § 300gg - 2(b)(1); 42 U.S.C. § 300gg - 42(b)(1).

Neither the statute nor the implementing regulations permit an issuer to terminate

coverage based on the source of the payments or contributions. Indeed, although the insurance

industry has pressured CMS to prohibit private premium support from 501(c)(3) organizations to

reduce its risks under the ACA, no such prohibition has been enacted. On the contrary, federal

regulations are expansive in allowing the consumer to select his or her "preferred payment

method," and do not limit the use of "paper checks," which must be "accepted," to only those

signed by the consumer. See 45 C.F.R. § 156.1240. Further, the open use of AKF grants to pay

for insurance is not – and cannot be – fraud. While it may have "discouraged" individual

providers from directly paying for a person's insurance premiums, CMS openly permits

charitable organizations, such as the AKF, to assist low income persons obtain insurance

coverage. See, e.g., Exhibit 4; Exhibit 5. IBC's threatened cancellations of coverage funded by

---

[13] 42 U.S.C. § 300gg-2(a) and 42 U.S.C. § 300gg-42(b) both contain rights conferring language
by specifying that unless a discontinuance of coverage is for a reason "as provided in this
section" an "individual" has the right to require the issuer to "continue in force for such coverage
at the option of the . . . individual." In contrast, there is no enforcement scheme or other
provision of law that reflects congressional intent to preclude a private right of action.

AKF grants therefore is likely to be found to violate the ACA's strict limits on terminating QHPs.

### 4. IBC's refusal to accept third party premiums violates Pennsylvania's Unfair Insurance Practices Act and Consumer Protection Law

IBC's discriminatory refusal to accept premium support only on behalf of low-income dialysis patients violates Pennsylvania's Unfair Insurance Practices Act (the "UIPA"), 40 P.S. § 1171.1 et seq., and the Consumer Protection Law (the "CPL"), 73 P.S. § 201-3. Both statutes prohibit unfair methods of competition and unfair or deceptive acts or practices. When an insured's allegations fall within the purview of acts prohibited by the UIPA, the insured may maintain a private cause of action under the CPL. See Pekular v. Eich, 355 Pa. Super. 276, 286-87 (1986).

Pennsylvania's CPL prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3. These prohibited acts include both certain specifically enumerated practices, and "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). "Pennsylvania courts have repeatedly held that violations of other statutes may also be violations of the CPL." Pekular, 513 A.2d at 432. The UIPA, 40 P.S. § 1171.1 et seq., deems certain enumerated practices in the insurance industry to be unfair or deceptive, including:

> **Making or permitting any unfair discrimination between individuals of the same class** and of essentially the same hazard in the amount of premium, policy, fees or rates charged for any policy or contract of insurance or in the benefits payable thereunder, **or in any of the terms or conditions of such contract, or in any other manner whatever.**

40 P.S. § 1171.1(a)(7) (emphasis supplied).

Here, IBC is refusing to accept payment on behalf of low-income dialysis patients while accepting the same amount of payment by higher-income dialysis patients. This conduct constitutes both discrimination in a "term[] or condition" of the policy and discrimination "in any

other manner whatever" within the meaning of 40 P.S. § 1171.1(a)(7). It is therefore an unfair or deceptive practice that violates the UIPA, which is actionable by (or by DPC on behalf of) individual consumers under the CPL. IBC also has changed the rules of the game after it started by announcing it would not accept AKF payments *after* the Individual Plaintiffs and other DPC members had purchased coverage and the ACA open enrollment period had ended, which was inherently deceptive and highly prejudiced to consumers potentially left with no health insurance coverage.

IBC's on again-off again rejection of premium support from the AKF for purchases of Medigap plans equally violates Pennsylvania insurance law and the CPL. See Exhibit 8; Exhibit 9. The Insurance Department regulates Medicare Supplemental Insurance, or Medigap plans, through its administration of the Commonwealth's insurance laws and regulation of the insurance industry. See, e.g., 31 Pa. Code §§ 89.776, 89.790. 31 Pa. Code § 89.776(1)(v)(B) provides that the issuer of a Medicare supplement policy "may not cancel or renew the policy for a reason other than non-payment of premium or material misrepresentation." (emphasis added). 31 Pa. Code § 89.790 provides that an issuer of a Medicare supplement policy may not "[d]eny or condition the issuance or effectiveness of a Medicare supplement policy described in subsection (e) that is offered and is available for issuance to new enrollees by the issuer," "[d]iscriminate in the pricing of such a Medicare supplement policy because of health status, claims experience, receipt of health care or medical condition," or "[i]mpose an exclusion of benefits based on a preexisting condition under such a Medicare supplement policy."

IBC's threatened cancellations of Medigap coverage based on its own refusal to accept premium payments on behalf of low-income dialysis patients violates Pennsylvania's insurance law, since a payment for a consumer by a charity is *not* a "non-payment" of a premium. This practice therefore violates the CPL and the UIPA. IBC's refusal to accept third party premium

21

support only on behalf of low-income or ESRD patients also violates Pennsylvania law because it is unfair discrimination in a term or condition of an insurance policy.

IBC recently "suspended" its policy of refusing AKF grants to pay for Medigap policies. See Exhibit 9. IBC's unilateral "suspension" of a portion of its discriminatory policy against accepting premium support does not obviate the propriety of injunctive relief that extends to Medigap coverage. A private party who voluntarily discontinues a challenged practice bears a "heavy burden" to make it "absolutely clear" that the "wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 187-193 (2000); Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 217 (3d Cir. 2005). In this case, IBC expressly reserved the right to reinstate the contested policy to Medigap plans at any time, and in its sole discretion. See Exhibit 9. Under these circumstances, IBC cannot meet the "heavy burden" of mooting plaintiffs' application to enjoin the anti-charity policy as it applies to premium assistance for Medigap plans because it cannot be said with assurance that there is no reasonable expectation that the policy will not be reinstated in full, or that IBC's temporary "suspension" of the IBC policy as to Medigap coverage has been completely eradicated. See In re: Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 318 (3d Cir. 1983) (rev'd on other grounds).

Finally, IBC's conduct violates the Pennsylvania Health Plan Corporations Act (the "HPCA"), 40 Pa. C.S. § 6101 et seq., § 6301 et seq., also known as the Blue Plans Act. The HPCA makes Blue Cross and Blue Shield plans insurers of last resort, in exchange for broad exemptions from state and local taxation. See Ciamaichelo, 589 Pa. at 418. Rather than permitting Blue Plans to pick and choose whom they will insure based on the source of payment, the HPCA states that premiums may be paid by "the subscriber or someone on his behalf." 40 Pa. C.S. § 6326(3). The provisions of the HPCA that protect consumers' right to purchase

coverage from IBC are enforceable both under the CPL, as an implied right of action under Schappell v. Motorists Mut. Ins. Co., 934 A.2d 1184, 1189 (Pa. 2007), and under the Pennsylvania non-profit law, 15 Pa. C.S. § 5793(a). Plaintiffs therefore are likely to prevail on their claims against IBC under the HPCA.

> **5.** **IBC has breached its contracts with the Individual Plaintiffs by refusing to accept premium payments without contractual authority to do so**

The Individual Plaintiffs have health insurance contracts for 2017 with IBC that cover treatment for ESRD. See Jane Doe 1 dec. at ¶ 13; John Doe 2 dec. at ¶ 9; Jane Doe 4 dec. at ¶ 15; John Doe 5 dec. at ¶ 14. The Individual Plaintiffs pay (and have paid or offered to pay) their policy premiums using AKF grant proceeds. See Jane Doe 1 dec. at ¶ 14; John Doe 2 dec. at ¶ 10; Jane Doe 4 dec. at ¶ 22; John Doe 5 dec. at ¶ 18. IBC has no contractual authority to refuse the Individual Plaintiffs' premium payments because they are funded by a particular source. Yet, IBC unequivocally has refused to accept third party premiums on behalf of the Individual Plaintiffs. IBC told the Individual Plaintiffs that if they did not pay their premiums from another source, then their insurance would be terminated. See Jane Doe 1 dec. at ¶ 19; John Doe 2 dec. at ¶ 14; Jane Doe 4 dec. at ¶ 25-26; John Doe 5 dec. at ¶ 21-22; Exhibit 6; Exhibit 8. In fact, IBC actually terminated John Doe 2's insurance. See John Doe 2 dec. at ¶ 15. The refusal to accept payment and notice that coverage would be terminated is a breach of contract.

IBC's insurance contracts do not permit IBC to refuse to accept premium payments funded by a particular source, particularly a lawful source such as a 501(c)(3) organization whose arrangements have been vetted by the OIG. See Exhibit 4. By course of past performance, IBC had interpreted its own policies as permitting third-party payments, and any potential ambiguities in the insurance contracts would be properly resolved against IBC as the drafter of its own policies. See Jamgochian dec. at ¶ 43; Jane Doe 1 dec. at ¶ 14; John Doe 2

dec. at ¶ 10; Jane Doe 4 dec. at ¶ 22; John Doe 5 dec. at ¶ 18; <u>American Legacy Found., RP v. National Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 623 F.3d 135, 139 (3d Cir. 2010) ("To the extent that ambiguity does exist, the doctrine of <u>contra proferentum</u> requires that the language of an insurance contract be construed most strongly against the insurance company that drafted it."). IBC's insurance contracts run for a one-year term – subject to renewal – ending December 31, 2017. <u>See</u> Jamgochian dec. at ¶ 51. IBC has no contractual right to terminate health insurance policies based on the source of the premium payments, and no contractual right to refuse to accept premium payments funded by AKF grant proceeds.

### B.  Plaintiffs will suffer irreparable harm without a preliminary injunction

Plaintiffs must show that they are likely to suffer irreparable harm absent injunctive relief. <u>See</u> <u>Issa</u>, 847 F.3d at 131. Without a preliminary injunction, DPC's members and the Individual Plaintiffs stand to lose their health insurance and suffer an interruption in access to life-sustaining dialysis treatment, resulting in death. <u>See, e.g.</u>, <u>East v. Blue Cross & Blue Shield of Louisiana</u>, 2014 WL 8332136 at *2 (M.D. La. Feb. 24, 2014) ("It goes without saying that Mr. East's eventual death is an irreparable injury."); Jamgochian dec. at ¶ 11; Jane Doe 1 dec. at ¶ 7; John Doe 2 dec. at ¶ 7; Jane Doe 4 dec. at ¶ 29; John Doe 5 dec. at ¶ 25. Additionally, the Court may also presume irreparable injury because IBC is violating a federal statute. <u>See</u> <u>United States v. Richlyn Labs, Inc.</u>, 827 F. Supp. 1145, 1150 (E.D. Pa. 1992).

### i.  Plaintiffs are likely to suffer irreparable harm without a preliminary injunction based on the threat IBC's policy poses to their life-sustaining medical care

ESRD patients' loss of access to their health providers or insurance coverage altogether is an irreparable injury. <u>See, e.g.</u>, <u>DPC</u>, 2017 WL 365271 at *6. ESRD policyholders whose insurance premiums are refused may be left with no insurance at all, and therefore with no ability to pay for lifesaving dialysis. <u>See</u> John Doe 2 dec. at ¶ 17; Jane Doe 4 dec. at ¶ 18; John Doe 5

dec. at ¶ 16. Or, they may be forced into Medicare, which may be unavailable to them at this time, or require out-of-pocket patient payments that are unaffordable to them. See Jane Doe 1 dec. at ¶ 21. Although high out-of-pocket expenses can be mitigated by Medigap coverage, IBC also extended its policy to refusing AKF grants to pay for its subscribers Medigap policies. See Exhibit 8. While it has temporarily "suspended" its refusal to accept AKF funding for Medigap, IBC has expressly reserved the right to reinstate that restriction at any point in time, and without further notice. See Exhibit 9.

The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be adequately compensated after the fact by monetary damages. See Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85 (3d Cir. 2000). Evidence that plaintiffs will lose, or have to forego, medical care because of the heightened costs of a health plan can establish irreparable harm. See Adams, 204 F.3d at 485. The possibility of being denied medical care as a result of not having insurance is a substantial and irreparable injury. See United Steelworkers of Am., AFL-CIO v. Fort Pitt Steel Casting, Div. of Conval-Penn, Div. of Conval Corp., 598 F.2d 1273, 1280 (3d Cir. 1979). Indeed, the U.S. District Court for the Eastern District of Texas has already found that ESRD patients will suffer irreparable injury if insurers were permitted under the enjoined Interim Final Rule to terminate their coverage based on their use of third party premium support, stating:

> ESRD patients would also suffer irreparable injury were the Rule to go into effect. The Fifth Circuit finds irreparable injury where a proposed rule would deny patients needed medical care or "the legal right to the qualified provider of their choice." Planned Parenthood of Gulf Coast, Inc. v. Gee, 837 F.3d 477, 501 (5th Cir. 2016). Not all ESRD patients qualify for Medicare, and Medicare does not cover family members. Further, many health care providers do not accept Medicare. Therefore, some ESRD patients and their families could lose access to their health care providers or even lose insurance coverage altogether. The Court finds Plaintiffs have satisfied their burden in showing irreparable injury.

DPC, 2017 WL 365271 at *6.

plaintiffs are similarly situated – in terms of irreparable harm – to all the other plaintiffs."

Adams, 204 F.3d at 487. DPC's members and the Individual Plaintiffs all have ESRD, and receive third party premium support based on their low-income status and financial need. They are all similarly situated such that IBC's actions – depriving them of needed funding for their health insurance – place them all at risk of irreparable harm. All ESRD policyholders face the same risks with respect to losing their health insurance or being forced to pursue coverage under Medicare or Medicare because of their common disability and lack of financial resources to otherwise pay their premiums without third party support. See also East, 2014 WL 8332136 *2.

### ii. The Court also can presume irreparable harm based on violations of federal law

This Court also may "presume[]" irreparable harm arising out of IBC's violation of a federal statute, namely the ACA and its associated regulations in the absence of an injunction. See Richlyn Labs, Inc., 827 F. Supp. at 1150 (noting that "passage of the Food, Drug and Cosmetic Act" constituted "an implied finding that violations [thereof] will harm the public and ought to be restrained if necessary"). Irreparable harm may be found where probable cause exists to believe that the statute in question is being violated and there is some reasonable likelihood of future violations. See United States v. Roach, 947 F. Supp. 872, 877 (E.D. Pa. 1996). A presumption of irreparable harm may be proper and appropriate under certain statutes. See ReMed Recovery Care Ctrs. v. Township of Willistown, Chester Cty., Pa., 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999). See also Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 803 (3d Cir. 1989); Marxe v. Jackson, 833 F.2d 1121, 1128 n.3 (3d Cir. 1987). Here, Plaintiffs seek to prevent manifest violations of the ACA that would necessarily inflict irreparable harm upon the persons these laws were designed to protect. In addition to showing a reasonable likelihood of success on the merits, therefore, plaintiffs need only show "probable

cause" that defendants' actions will violate the ACA, and need not demonstrate "the precise way in which [the] violations will result in public harm." Richlyn Labs, 827 F. Supp. at 1150.

## C.    The balance of harms weighs in favor of granting an injunction

As Plaintiffs have shown a reasonable likelihood of prevailing on the merits and the likelihood of irreparable harm, the Court must consider whether granting the relief sought would harm IBC more than denying relief would harm Plaintiffs.  This entails balancing the relative harm to the parties, that is, comparing the potential injury to the plaintiff if an injunction does not issue to the potential injury to the defendant if the injunction is issued.  See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir. 2002).  The injury a defendant might suffer is discounted when the defendant brings that injury on itself.  See Novartis, 290 F.3d at 596.

Here, if the Court does not grant an injunction, DPC's members and the Individual Plaintiffs may lose their health insurance entirely, suffer a deprivation or interruption of lifesaving medical care, or be forced onto Medicare or Medicaid with lesser benefits than their existing plans offer or at a loss of healthcare coverage for their family members.  If, in contrast, the Court grants an injunction, IBC will merely have to continue depositing checks from third parties to cover the amounts IBC itself sets as premiums.  An injunction only would require IBC to continue to honor its existing contracts and accept premiums funded by charitable third parties, as insurance companies have done for twenty years as authorized and encouraged by HHS's 1997 Advisory Opinion.  See, e.g., DPC, 2017 WL 365271 at *6 (citing to the Advisory Opinion to explain that "HHS has long accepted the practice of charitable premium assistance…").  The only "harm" IBC will suffer will be the thwarting of its attempt to dump ESRD policyholders.  IBC may lose money insuring ESRD policyholders, but IBC brought that

injury on itself by electing to participate in the Pennsylvania Exchange and agreeing under law not to discriminate in coverage.

**D.     Granting relief would serve the public interest**

Finally, when deciding whether to issue a preliminary injunction, the Court considers whether granting the request relief would serve the public interest. See Issa, 847 F.3d at 131; Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 807 (3d Cir. 1998). "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Granting relief would serve the public interest because "[p]reserving the status quo ensures ESRD patients have the choice to select private or public insurance options based on their health care needs and financial means." DPC, 2017 WL 365271 at *6. An injunction serves the public interest by keeping ESRD patients insured and maintaining their access to lifesaving medical treatment.

**IV.     Bond Requirement**

Plaintiffs respectfully request that this Court order the posting of a nominal bond in the amount of $1,000.00. Fed. R. Civ. P. 65(c) provides that "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond is left to the Court's discretion, and while the posting requirement is much less discretionary, there are exceptions, such as when complying with the preliminary injunction raises no risk of monetary loss to the defendant. See Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010).

Nominal bonds may be appropriate where there is no evidence defendants will suffer financial loss from the injunctive relief and an important federal right is at stake. See, e.g., America Freedom Def. Initiative v. Southeastern Pa. Transp. Auth., 92 F. Supp. 3d 314, 331 (E.D. Pa. 2015) (requiring plaintiffs to post a nominal bond of $100 before granting the preliminary injunction to protect their First Amendment rights); Stilp v. Contino, 629 F. Supp. 2d 449, 468 (M.D. Pa. 2009) (requiring plaintiff to post a nominal bond of $250 where plaintiff sought to protect an important federal right and defendants did not stand to suffer direct pecuniary losses as a result of the injunction).

Plaintiffs seek to protect important federal rights under the ACA. A preliminary injunction only requires IBC to continue honoring its existing contractual obligations. To the extent those obligations cost IBC money, those losses are pursuant to contractual agreements that IBC knowingly and voluntarily entered into as a sophisticated commercial entity. Plaintiffs therefore respectfully request that this Court order Plaintiffs to post a nominal bond in the amount of $1,000.00.

## V.    Conclusion

Without a preliminary injunction to stop IBC's discrimination on the basis of disability the Individuals Plaintiffs and DPC's members may lose their health insurance. Without insurance, they will lose access to the dialysis treatments that keep them alive. Plaintiffs therefore respectfully request that this Court enter a preliminary injunction that maintains their

uninterrupted access to lifesaving treatment.

Respectfully submitted,

Dated: May 15, 2017

_/s/ Mark H. Gallant_
Mark H. Gallant (51767)
Aaron Krauss (62419)
Harper Seldin (318455)
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000
mgallant@cozen.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2017, Plaintiffs' Motion for Preliminary Injunction, and the Memorandum of Law in Support thereof, were filed electronically with the Court and a true and correct copy was served upon the following via U.S. mail, postage prepaid:

INDEPENDENCE BLUE CROSS
1901 Market Street,
Philadelphia, PA 19103

QCC INSURANCE COMPANY
1901 Market Street,
Philadelphia, PA 19103

/s/ Aaron Krauss
Aaron Krauss (62419)
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4181
akrauss@cozen.com
Attorneys for Plaintiffs